# EXHIBIT A

**(CIRCUIT/CHANCERY) COURT OF TENNESSEE**
**140 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

ELECTRONICALLY FILED
2017 Jun 20 PM 3:50
CLERK OF COURT - CHANCERY

## SUMMONS IN CIVIL ACTION

Docket No. _____

- ⦿ Lawsuit
- ○ Divorce

Ad Damnum $ _____

| | | |
|---|---|---|
| HYDRO DYNAMICS, LLC | VS | MID-AMERICA APARTMENTS, L.P., H. ERIC BOLTON, JR., THOMAS L. GRIMES, JR., JAMES MACLIN, AL GRAFF, JR., GARY SHORB, D. RALPH HORN, WILLIAM B. SANSOM, PHILLIP NORWOOD, W. REID SANDERS, CLAUDE B. NEILSON, individually and in their capacity as officers and directors of MAA, and EDWARD MOORE |
| Plaintiff(s) | | Defendant(s) |

TO: (Name and Address of Defendant (One defendant per summons))

MID-AMERICA APARTMENTS, L.P.
Attorney to Accept Service on Defendant's Behalf:
FRANK L. WATSON, III, ESQ.
WATSON BURNS, PLLC
253 ADAMS AVENUE
MEMPHIS, TENNESSEE 38103

Method of Service:
- ○ Certified Mail
- ○ Shelby County Sheriff
- ○ Commissioner of Insurance ($)
- ○ Secretary of State ($)
- ○ Other TN County Sheriff ($)
- ○ Private Process Server
- ⦿ Other

($) Attach Required Fees

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on  EDWARD M. BEARMAN                                      Plaintiff's attorney, whose address is  780 RIDGE LAKE BLVD., SUITE 202, MEMPHIS, TN 38120         , telephone    +1 (901) 682-3450 within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service. If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

TESTED AND ISSUED _____        By _____, D.C.

### TO THE DEFENDANT:

NOTICE; Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

### FOR AMERICANS WITH DISABILITIES ACT (ADA) ASSISTANCE ONLY, CALL (901) 222-2341

I,  JIMMY MOORE / DONNA RUSSELL , Clerk of the Court,
Shelby County, Tennessee, certify this to be a true and
accurate copy as filed this

_____

JIMMY MOORE , Clerk / DONNA RUSSELL, Clerk and Master

By: _____, D.C.

## RETURN OF SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE** SERVED THE WITHIN SUMMONS:

By delivering on the _22nd_ day of _June_ , 20_17_ at _____ M. a copy of the summons

and a copy of the Complaint to the following Defendant _Mid- America Apartments, L.P._

at _Watson Burns PLLC, 253 Adams Ave., Memphis, TN 38103_

_____
Signature of person accepting service

By: _____
Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE NOT** SERVED THE WITHIN SUMMONS:

To the named Defendant _____

because _____ is (are) not to be found in this County after diligent search and inquiry for the following

reason(s): _____

This _____ day of _____, 20_____.

By: _____
Sheriff or other authorized person to serve process



**The Shelby County, Tennessee Chancery Court**

**Case Style:**    HYRDO DYNAMICS, LLC V MID AMERICA APARTMENTS, LPH

**Case Number:**   CH-17-0898

**Type:**          Summons issued other

JENNIFER HALL, DC

Electronically signed on 06/20/2017 04:15:51 PM

ELECTRONICALLY FILED
2017 Jun 20 PM 3:50
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

HYDRO DYNAMICS, LLC,

       Plaintiff

v.

MID-AMERICA APARTMENTS, L.P., H. ERIC BOLTON, JR.,
THOMAS L. GRIMES, JR., JAMES MACLIN, AL GRAFF, JR.,
GARY SHORB, D. RALPH HORN, WILLIAM B. SANSOM,
PHILLIP NORWOOD, W. REID SANDERS, CLAUDE B.
NEILSON, individually and in their capacity as officers and
directors of MAA, and EDWARD MOORE,

       Defendants.

## HYDRO DYNAMICS, LLC'S COMPLAINT AGAINST MID-AMERICA APARTMENTS, L.P., H. ERIC BOLTON, JR., THOMAS L. GRIMES, JR., JAMES MACLIN, AL GRAF, JR., GARY SHORB, D. RALPH HORN, WILLIAM B. SANSOM, PHILLIP NORWOOD, W. REID SANDERS, CLAUDE B. NEILSON AND EDWARD MOORE

**COMES NOW** Plaintiff, Hydro Dynamics, LLC (hereinafter "Hydro") by and through counsel, hereby files this Complaint against Defendants Mid-America Apartments, L.P. (hereinafter referred to as "MMA"), H. Eric Bolton, Jr, Thomas L Grimes, Jr., James Maclin, Al Graff, Jr., Gary Shorb, D. Ralph Horn, William B. Sansom, Phillip Norwood, W. Reid Sanders, Claude B. Neilson and Edward Moore (collectively "Defendants") as follows:

### NATURE OF THE DISPUTE

1.    The dispute at the heart of this Complaint relates to MAA's breach of a fifteen-year contract with Fluid Dynamics, a company formed to market nationally the water-saving valves manufactured by Defendant Hydro Dynamics, LLC. MAA's fraud, extortion, and tortious interference have turned a simple breach of contract case into a fragmented dispute that is being

heard in Florida state court, AAA arbitration, and now in Tennessee state court. As a result of MAA's actions, detailed below, defendant Hydro Dynamics has suffered independent but related damages and therefore seeks compensatory damages, treble damages, punitive damages, declaratory and injunctive relief, and pre- and post-award interest.

## THE PARTIES

2.      Defendant Hydro Dynamics, LLC, is a limited liability corporation formed under the laws of the state of Delaware, with its principal place of business at 2275 Biscayne Boulevard, Miami, Florida 33137. At all relevant times, Hydro Dynamics, LLC was the manufacturer and producer of the water-saving valves at the heart of this dispute. Also at all relevant times, Hydro Dynamics was managed by Fluid Dynamics Holdings, the company formed by defendants Gary Waxman and Jeffrey Weiner.

3.      H. Eric Bolton, Thomas Grimes and James Maclin are or were officers of MAA and at all times herein were parties to the acts and causes of action alleged herein individually and/or in their capacity as agents for MAA.

4.      The following Directors of MAA are alleged to have participated in the schemes perpetuated on Plaintiff or ignored their duty upon notice to stop these schemes and thus have acted outside the scope of their duties and have failed in their individual capacity or their capacity as directors which has harmed Plaintiff:

- Al Graf, Jr.

- Gary Shorb

- D. Ralph Horne

- William B. Sansom

- Phillip Norwood

- W. Reid Sanders

- Claude B. Neilson

5.      Edward Moore is a Defendant who upon information and belief, participated in the predicate RICO actions as indicated below. As a co-conspirator, Mr. Moore has subjected himself to the jurisdiction of this court.

## BACKGROUND FACTUAL ALLEGATIONS

### I.      Fluid Is Formed to Develop a Business to Market and Lease the Valve

5.      In late 2010, Gary Waxman and Jeffrey Weiner started Fluid Dynamics Holdings ("Fluid") to market and lease water savings valves manufactured by Hydro Dynamics ("Hydro").

6.      Under that leasing model, Fluid would install the valves at no cost to the customer in exchange for a percentage of the customer's savings on their water bill created by the valve.

7.      Fluid actively solicited business in the multi-family housing market.

### II.     Fluid Secures MAA, One of the Top Twenty Multi-Family Apartment Building Owners, As A Customer

8.      In April 2011, as part of Fluid's outreach to many potential large-water-usage clients, Fluid made its first contact at Mid America Apartments ("MAA") with a phone call to Thomas Grimes, MAA's COO.

9.      To follow up on the phone call, Mr. Ward sent three emails to Mr. Grimes attaching a series of technical reports detailing the workings and certifications for Fluid's product. Those reports included:

- a "Practical Field Report," which discussed how the valve "regulates the flow of water";

- an Engineering Laboratory Test Report from NSF International, which discussed how the valve reduced test air flow by thirty-eight percent (38%), among other things;

- a white paper by Dr. Héctor Guevara titled "Controlling water flow speed and volume by using a smart valve control node at meter egress point";

- a copy of the filing receipt for Mr. Barreda's then-pending patent on the valve; a one-page informational diagram and installation instructions;

- a certification of secondary review by an engineering company of the white paper by Dr. Guevara; and

- a series of certifications from IAPMO Research and Testing, a product certification company, certifying that the valve was safe to be used with drinking water.

10.     In early June 2011, when Fluid followed up again with MAA, Mr. Grimes asked that the background materials above be sent to James Maclin, MAA's Senior Vice President in charge of utility billing.

11.     When Mr. Maclin received the attachments above, he forwarded them on to his deputy, Brandon Whitmire and asked him to do some research into Fluid.

### III.    MAA's Senior Vice President, James Maclin, Saw an Opportunity to Take Advantage of MAA's Position of Economic Power to Make Money for Himself and His Friends

12.     In September 2011, MAA was equivocating on its interest in the valves when, out of the blue, Mr. Maclin notified Fluid that it was interested in the valves and that "MAA would really like to take this opportunity to increase its minority partnerships thru Imani Environmental Group, Inc,. The contact/owner is Mr. Eddie Moore. . ." Imani was a predecessor to Olive Branch Consulting.

13.     Unbeknownst to Fluid, immediately before sending that e-mail to Mr. Ward, Mr. Maclin reached out to Edward ("Eddie") Moore, his college football buddy, saying: "I just talked to the lead guy with Fluid Dynamics. ...he is aware of MAA's need for minority partnership involvement." This fact was only recently discovered through discovery in a related action.

14.     When Fluid questioned and pushed back on the need for Mr. Moore's involvement, Mr. Maclin withdrew his interest in contracting with Fluid: "it does not seem like

there is an opportunity for MAA but we are going to review again with our consultants and lawyers."

15.     Fluid continued to pursue MAA and began discussions with Mr. Moore for him to be a sales representative of Fluid.

16.     As part of those discussions, Mr. Moore visited Fluid's manufacturing factory run by Hydro, and met with Mr. Waxman.

17.     Fluid eventually accepted Mr. Maclin's message, which was communicated as an absolute requirement, that if Fluid wanted to work with MAA, it would have to partner with Mr. Moore.

18.     In mid-November 2011, Fluid began to finalize a sales representation agreement with Mr. Moore.

19.     Immediately after Fluid and Mr. Moore's relationship began to solidify, MAA became interested in the valve again and Mr. Maclin asked for a draft agreement, which Fluid provided.

20.     Fluid has now learned that, behind the scenes, Mr. Moore and Mr. Maclin had already been colluding to insert Mr. Moore into the Fluid-MAA relationship so that both would make money.

21.     Fluid embraced Mr. Moore's involvement – not realizing he was a plant for MAA – making him part of the senior management team, giving him a sales commission agreement, and asking him to engage MAA as the lead negotiator.

22.     MAA and Fluid entered into vigorous discussions, with Mr. Moore taking the lead for Fluid on many important aspects of those negotiations.

23.     Among other things, Mr. Moore 1) negotiated the savings sharing plan, which

gave Mr. Moore's company, Olive Branch Consulting, a significant share of the payout resulting from the cost savings MAA expected to experience; and 2) coordinated a pilot program for testing the efficacy of the valves.

24.     MAA's willingness to give Olive Branch Consulting a significant share of the cost savings that would have otherwise gone to MAA was surprising at the time; although Mr. Maclin assured Mr. Waxman that everything was above board.

25.     Fluid has since learned that the arrangement was a canard designed to make Mr. Moore money to the detriment of MAA and its shareholders and in direct conflict of interest to Fluid.

26.     Mr. Moore was on MAA's payroll the entire time he was conducting what appeared to be his own due diligence as a "water expert" and even while he was on Fluid's senior management team negotiating Fluid's contract with MAA on Fluid's behalf.

27.     MAA's payments to Mr. Moore continued through January 2014, even after MAA had allegedly (much later) disavowed a partnership with Olive Branch Consulting.

28.     Fluid has not been able to see Mr. Moore's, Olive Branch's, or Mr. Maclin's bank records, which may show how the money flowed between Mr. Maclin and Mr. Moore.

29.     As part of the transfer of benefits from MAA to Olive Branch Consulting and back to Mr. Maclin, Mr. Moore sold a 1971 Chevelle, a classic muscle car, to Mr. Maclin for significantly less than the car's true worth.

## IV.     MAA's Chief Executive, Chief Operating Officer, and Board of Directors Turn a Blind Eye to MAA's Conflict of Interests

30.     MAA essentially let Mr. Maclin have complete control over the negotiations with Fluid, with no oversight.

31.     Neither of Mr. Maclin's supervisors, Mr. Grimes or Drew Taylor, were involved

in the negotiations beyond introducing Mr. Maclin to Fluid. Nor did Mr. Bolton, MAA's CEO, or Mr. Grimes, its COO, approve the contract before Mr. Maclin signed it on behalf of MAA. Neither was even aware of the first contract when it was signed. When Mr. Maclin signed the contract with Fluid, MAA corporate policy prohibited him from doing so. Neither Mr. Grimes nor Mr. Bolton adhered to this policy.

32.   MAA's Board of Directors did not conduct any due diligence or approve the Fluid Agreement before it was signed.

## V.   MAA and Fluid Sign a Fifteen Year Deal to Install Fluid's Valves and Share the Resulting Savings

33.   In December 2011, MAA and Fluid reached final agreement on a Master Valve Lease Agreement ("the Agreement").

34.   Mr. Maclin inserted a "minority participation program" and a "savings sharing plan" that divided the savings on MAA's water bills between MAA, Fluid Dynamics, and Olive Branch Consulting. MAA did not have a formal "minority participation program" and did no due diligence before contracting with Olive Branch Consulting and Mr. Moore. Indeed, no one other than Mr. Maclin knew of Olive Branch Consulting's or Mr. Moore's inclusion of the contract until approximately one year later when MAA's internal audit discovered their inclusion.

35.   Due to the immediate success of the initial installations, MAA asked Fluid to install the valve on all of MAA's remaining properties.

36.   By October 24, 2012, the valves had been installed, and were saving water, on at least seventy-six MAA properties.

37.   The first property on which the valves were installed has become a poster-property for the value of the valves manufactured by Hydro and marketed by Fluid. Not only did the valves save MAA significant amounts of money, but when the property was sold, the new

owner maintained the valve and the property's agreement with Fluid and has saved significantly on monthly water bills.

**VI.    MAA Closely Supervises Installation of Valves on Its Properties, Insisting on Approving All Plumbers, and Monitoring Permitting and Interactions with Local Authorities.**

38.    MAA through its SVP, Director of Corporate Services, Mr. Maclin, were actively engaged throughout the installation process in all of its properties. In the beginning, Mr. Maclin developed the installation plan for all of the valves under which Fluid or its associated companies would install the valves on MAA's properties.

39.    The plan was to install calibration systems throughout the entire MAA portfolio in less than a year. This was to be accomplished through a three-phase installation, with each phase covering several states. Each of the phases was to include a Request for Proposal ("RFP") process, which would represent a survey to assess water system, determine a number of meters, their locations, types and size of water lines.

40.    Mr. Maclin's engagement with the installation process continued throughout Fluid's relationship with MAA. Mr. Maclin actively assisted Fluid in developing the employee manual to train the individuals who were installing the valves.

41.    MAA was also responsible for securing cooperation with the water utility when necessary. Mr. Maclin was the primary contact for property managers to gather information about water lines to determine which meter vaults are locked. Mr. Maclin asked all of his property managers to submit Inspection Forms detailing the results of their survey.

42.    The information obtained from the property managers was then used to coordinate efforts contacting the utility companies to open the vaults for assessment and installation.

43.    Mr. Maclin was responsible for instructing property teams to contact utilities and unlock the meters.

44.     When meter vaults or meter themselves were broken, Mr. Maclin was in direct contact with utility companies and cities to repair them prior to installation of Fluid's calibration devices.

45.     MAA, through Mr. Maclin, took an active, if not leading, role in the process of assessing the water systems prior to each and every installation.

46.     MAA's control over the installation process extended to telling Fluid on which lines it should install its valves. For example, in September 2012, Mr. Maclin instructed Fluid to install on a combination line – a line serving both residential water usage and fire suppression systems – if the line was actually "material in usage."

47.     At the end of the day, MAA knew exactly where every single Fluid device was installed and on which type of line it was installed. Indeed, Mr. Maclin, as the agent of the property owner, exercised ultimate authority over MAA's property.

48.     Fluid was instructed to listen to the property manager's instructions. Mr. Maclin made clear, not only did the property owners know their properties best, including what types of water lines they had, but the property owners were "accountable for everything on the property."

49.     Not only did MAA take control and oversight of which water lines should receive a Fluid valve, Mr. Maclin managed and oversaw Fluid's retention of plumbers and procurement of permits.

50.     MAA also instructed Fluid that plumbers were not always necessary for each installation and directed Fluid as to which properties it wanted to have plumbers take care of the installation and at which it did not.

51.     Fluid and MAA were engaged in almost daily discussions on the progress. In addition to updates before and during every installation, Fluid and MAA exchanged a profuse

number of emails upon completion of the installations to update MAA on installations attaching reports that showed which line received a valve and associated meter numbers.

52. MAA also controlled the overall progress of the project. Mr. Maclin established that the valves would be installed on all of MAA's properties at the time in three main phases. Mr. Maclin dictated how many installations could be performed weekly and which plumbers would be used onsite.

53. One of the justifications Mr. Maclin gave for Mr. Moore's involvement with the installation process was that, as a "water expert," Mr. Moore would be able to manage the valve's installation and ensure that it was done correctly. Documents show that before Mr. Maclin called Fluid to hire Mr. Moore "to coordinate and get us thru [the] test" in February 2012, Mr. Maclin was already consulting with Mr. Moore on the plumbers issue and having Mr. Moore (not Fluid) contact plumbers for the upcoming RFPs in October-December 2011 and first installations in January and February 2012.

## VII. James Maclin agrees to endorse Fluid's valves in exchange for Eddie Moore receiving a percentage of all future Fluid leases.

54. By July 2012, MAA's properties were seeing significant savings on their water bills, Fluid was receiving payments, and Fluid was paying Olive Branch. Hydro was also receiving the benefit of manufacturing more valves.

55. Mr. Maclin used his position within MAA to feed Mr. Moore confidential information to give Mr. Moore an unfair competitive advantage, and thus hopefully to help Mr. Moore close deals and earn the resulting commission. For example, in July 2012, Mr. Maclin sent Mr. Moore confidential information about a property MAA was selling; a property that did not yet have a valve installed. Despite the fact that vendors were not supposed to contact the buyer until after closing, Mr. Maclin sent Mr. Moore the property's details with a veiled

message: "FYI...buyer of one of our properties in Atlanta...but NOT currently in the GreenValve program. Just an FYI."

## VIII. MAA, Mr. Maclin, Olive Branch Consulting, and Mr. Moore enter into an enterprise to extort money from Fluid

56.     Sometime around July 2012, Mr. Maclin appears to have recognized that his endorsement of the valve would carry tremendous weight and would help Fluid make a lot of money. But simply giving his endorsement would not enrich Mr. Maclin or Mr. Moore and so he and Mr. Moore set out to capitalize on their position.

57.     First, Mr. Maclin and Mr. Moore needed to ensure that Olive Branch Consulting would receive a percentage of all new leases in the multi-family residential housing industry. To that end, Mr. Moore approached Fluid in August 2012 requesting a 1.5% commission for *Olive Branch Consulting* for any deals that *MAA* helped to close.

58.     Fluid was initially very skeptical – it made no sense for Olive Branch Consulting to get a financial benefit for deals with other parties that MAA helped to close.

59.     To push Fluid into accepting the deal with Olive Branch, Mr. Maclin increased the pressure. Mr. Maclin made his endorsement of Fluid's valves dependent on a signed agreement granting Olive Branch Consulting a 1.5% commission.

60.     Fluid realized the opportunity to get MAA's endorsement was too valuable to pass and accepted Mr. Maclin's offer. The agreement with Mr. Moore was signed on September 14, 2012. MAA and Olive Branch released Mr. Maclin's endorsement that same day.

61.     Mr. Maclin kept his side of the bargain, for a time. A few days later, Mr. Maclin proposed different types of testimonials he could provide; Mr. Moore wanted all three. Mr. Maclin even went out of his way to proactively invite potential customers to view installations.

62.     Mr. Maclin's endorsement was distributed to hundreds of multi-family housing

property managers at Mr. Maclin's insistence. His endorsement had an immediate effect such that many new potential clients contacted Fluid and MAA to get involved in the program.

63.     The anticipated increase in demand would have brought Hydro a significant financial benefit for its part in manufacturing the valves.

64.     Second, Mr. Maclin needed to increase Fluid's exposure. While Mr. Moore and Mr. Maclin were maneuvering to get Olive Branch Consulting a commission on all sales, Mr. Maclin invited Fluid to an upcoming multi-family housing conference in Las Vegas. Mr. Maclin knew that Fluid would jump at the opportunity and that his endorsement in that community would be as good as gold. He then went out of his way to use his role within MAA to drive business to Fluid and thus to Hydro and to assist Mr. Moore in building contacts to increase Mr. Moore's commissions.

**IX.     After the Fluid valves prove to save MAA significant amounts of money, JEA Makes Spurious Claims of Illegal or Unsafe Valve Installations and a Malicious Pledge from JEA to Force Removal of Every Valve in Jacksonville, Regardless of Placement.**

65.     In Fall 2012, JEA began to notice that some of its top revenue producing water meters were producing significantly less revenue. In their investigation they noticed a correlation between properties with the valves and decreased revenue.

66.     On November 15, 2012 – despite the fact that as early as July 2012 JEA was fully aware that MAA was installing Fluid's valves on MAA's properties in Jacksonville, had opened meter vaults for Fluid's inspection, and had been to at least one of MAA's properties to inspect those installations – JEA contacted MAA claiming it had discovered valves installed in violation of municipality rules.

67.     At first MAA's response to JEA's assertion was "that the calibration system is installed legally and on MAA property." But MAA's support diminished quickly and without a

reasonable or understandable basis.

68.     JEA took an aggressive and threatening approach with MAA. In November 2012, JEA contacted a property manager at Woodhollow, expressing concerns about media coverage "statewide" regarding the installation of the valves and threatening "to make an arrest [of] the folks at Precision" (Precision references Fluid) At that point no media coverage had occurred and would not occur for another almost three weeks.

69.     Days after it first notified MAA of its concerns, JEA had taken matters into its own hands. MAA informed Fluid that JEA believed the "calibration systems are install[ed] on fire lines and [are] hurting flow and [are] putting MAA residents at risk" and that JEA was "in the process of removing the calibration system."

70.     Fluid tried to resolve issues with JEA and MAA and was told everything was fine and that the parties could all work together. MAA and JEA told Fluid that device removal would be put on hold while the parties discussed how to proceed.

71.     A meeting between JEA, MAA, Fluid, the City of Jacksonville ("COJ"), and the Jacksonville Fire and Rescue Department ("JFRD") was set for December 3, 2012.

72.     While waiting for the December 3 meeting to occur, however, JEA and MAA did not stand down as they promised they would. Instead, they continued to remove valves that they claimed were installed on water lines – called combination lines – that provide water for both fire safety and general residential use.

73.     Fluid continued to engage JEA proactively to address its concerns. In late November 2012, Fluid informed Mr. Maclin that "[a]t its own cost, Fluid Dynamics is willing and ready to remove the calibration system . . . . If required, JEA personnel can certainly attend and oversee this removal at a mutually convenient arranged time."

74.     But JEA and MAA refused to accept Fluid's offers, citing "meter tampering" as the reason why Fluid could not remove the valves itself despite its contractual right to do so.

75.     On December 3, 2012, Fluid met with JEA, City of Jacksonville, Jacksonville Fire Department ("JFRD"), and MAA concerning the valves. Fluid walked away from that meeting with the impression that it had made inroads with the Jacksonville agencies concerning the valves and that all parties would work together to assist Fluid and MAA with performance of the parties contract.

76.     On or about December 4, 2012, however, JEA's spokesperson spoke to reporters at ActionNews and First Coast News in Jacksonville and brought to their attention JEA's allegations of meter tampering and the safety of the valves.

77.     Around the same day, a reporter from First Coast News in Jacksonville, Florida, called Mr. Maclin for his comment on the JEA's investigation of "meter tampering" on MAA's properties in Jacksonville. Mr. Maclin did not repeat his internal "talking points" which defended MAA's use of the valve and ensured the public that the valve was tested and safe, but instead acquiesced to JEA's pressure and indicated a mutual respect for its partnership with JEA without mentioning Fluid's cooperation and desire to resolve the issues with both JEA and MAA.

78.     That evening the First Coast News aired its story concerning the valves. That story painted a dooms day possibility of people's lives and property in jeopardy in case of fire due to the installation of the valves. The story also suggested that persons could be sick from drinking water from lines where the valves were installed. In addition, JEA accused "Precision Flow" of meter tampering, trespassing, and installing the valves illegally because it had not pulled permits.

79.     Throughout this period Fluid was actively engaged in attempting to cure any real

problems and counter the false allegations.

80.     Fluid hired a licensed fire sprinkler system inspector to perform the testing requested by MAA and sent to Mr. Maclin and the JFRD the positive results showing that the valves were not affecting firefighting capabilities and the locations were "in good working order" the next day on December 6.

81.     Meanwhile JEA and MAA continued their media attack on Fluid and the valves by sending to First Coast News an email:

> This device acts as a restrictor and significantly reduces flow rate. The consequences our ongoing investigation has [sic] uncovered are:
>
> 1. Reduced flow alters the original fire protection design and is a safety concern.
> 2. The flow restriction on the low side of the large meters, diverts the water to the large side of the meter. At medium flow rates, the large side cannot measure this flow, affecting accuracy of the meter.

82.     On or about December 6, 2012, MAA lobbyist reported that based on his call with the Jacksonville Fire Marshal, COJ "is going to be very reasonable and will follow JEA [sic] lead" and that the Fire Marshal "just wants documentation that [the valves are ]not on fire lines or shared lines until technology is proven." Importantly, the Fire Marshal also stated that he "[did] not care if PF is on dedicated water only lines, will leave that to JEA." While the Fire Marshal continued to believe that the valves restricted flow in a way that would affect fire hydrants, he remained "open to further tests" to verify the accuracy of his concerns.

## X.   MAA Makes the Calculated Decision to Repudiate Its Fifteen Year Contract with Fluid, and Proceeds to Remove the Precision Flow System from Every Property in Every State, in Blatant Breach of Its Contract with Fluid.

83.     Faced with JEA's ire, MAA decided it would rather breach its contract with Fluid than jeopardize its relationships with JEA and the City of Jacksonville.

84.     MAA directed its lobbyist to inform JEA that it would be removing all of the

valves from all of MAA's properties across its portfolio, not only from the Jacksonville properties.

85.    Sometime on or about December 6, 2012, MAA's lobbyist called Jim Dickenson (the CEO of JEA) to discuss MAA's concern about "JEA's media response on the Mid-America issue"; specifically, that JEA "took a negative position with the media vs [how it] positioned [itself] in the meeting that was held" on December 3. That call from Mr. Diebenow, a Lobbyist for MAA, prompted Mr. Dickenson to contact JEA's Vice President of Customer Relations and demand that she call Mr. Diebenow to address Mr. Diebenow's concerns. After JEA's Vice President's call to Mr. Diebenow, Mr. Diebenow forwarded to JEA's Vice President an email highlighting JEA's problematic media statements in the ActionNews story.

86.    Shortly after JEA's Vice President challenged JEA's policy, she was fired.

87.    Meanwhile, MAA's lobbyist represented to Fluid that everything was going well with the Fire Marshal and JEA, while giving no clue to Fluid that MAA had already decided to remove the valves from all of its properties.

88.    Just before noon that same day, minutes after Mr. Diebenow had told Fluid it was working on a "collaborative" relationship, MAA delivered the fatal blow to Fluid and therefore Hydro. In an email from Mr. Maclin to Mr. Weiner and Mr. Waxman, MAA unilaterally terminated the Master Valve Lease Agreement:

> Due to recent findings by JEA, the Jacksonville Fire Department and Fire Marshal that the calibration systems pose a life threatening risk to our customers, MAA is in the process of removing all of the calibration systems throughout all of MAA's properties."

89.    Shortly after notifying Fluid that it had terminated the Master Valve Lease Agreement, MAA sent an email to JEA giving "MAA's authorization for the **JEA to remove <u>all</u> Precision Flow devices from MAA's property in Jacksonville, Florida.**"

90.     MAA's public relations team did not hesitate in releasing news of its decision to pull the valves and did not hedge in its acquiescence to JEA's unfounded allegations. In a media statement drafted the same day for MAA's residents, MAA wrote:

> *After detailed conversations with the Jacksonville Electric Authority (JEA), the Fire Department and the Fire Marshal,* Mid America Apartments is in the process of having all the Precision Flow systems from our Jacksonville communities removed. *These agencies had several questions and concerns about the Precision Flow devices, so out of an abundance of caution,* we decided to take these systems out of our communities until all concerns could be addressed.

91.     For Fluid's part – several hours before MAA had given notice to Fluid of its repudiation – Fluid drafted a strong and fact-filled press release to address the incorrect, unfounded, and negative media statements in hopes of mitigating the damage being done to fluid and Hydro. This was important to Fluid because MAA seemingly refused to counter JEA's claims publicly, even though MAA had already disavowed JEA's statements in emails to the JEA and internally. However, MAA's PR specialist, told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on. Still believing that all of the parties were working as partners in a collaborative stance, Fluid accepted MAA's direction. Fluid did not realize at the time that Mr. Finotti was not looking out for Fluid's interest and was ignoring the fact that the bad press would likely cause Fluid significant harm.

92.     Additionally, Fluid was diligently working to make things right with both JEA and MAA. Relying on its contractual right to cure any curable issues, Fluid engaged in the necessary steps to "cure" JEA's concerns, even though Fluid did not agree with them.

93.     Recognizing post-facto that no one had actually checked the veracity of JEA's claims, Mr. Davis, MAA's internal auditor, asked Mr. Grimes whether anyone had actually checked whether the problem was actually JEA's problem, not Fluid's.

I am interested in the plumbing work part because that implies the installation was faulty. Has anyone measured the water pressure since the valves were removed? ... I was told that the reason JEA wanted to remove the valves was that the fire department measured the water flow with the devices on and found several properties with water pressure too low to fight fires. *I am asking whether anyone has checked to see if the low pressure was the valves or an inherent problem in the Jacksonville water delivery system.*

94.     Mr. Maclin responded only to point out that:

JEA's testing was done in there lab and not onsite. We have data on pressure before and after installed as measured by FD/PF. Since JEA's statements, we have been focusing on getting them removed and not proving the validity of the precision flow product. Other than JEA's concerns, we do not have any documentation of low flow and/or pressure.

## XI.   MAA Falsely Pretends That It Intends to Reinstall Fluid's Valves on Its Properties in An Attempt to Avoid the Consequences of Its Breach.

95.     In the months that followed that termination email, which MAA knew constituted a clear breach of the Agreement, MAA sought to avoid the consequences of its breach by leading Fluid to believe that MAA was interested in reinstalling the valves. While Fluid did not know it at the time, MAA's expressed interest in allowing Fluid to cure any breach was just a ruse designed to stave off Fluid's assertion of its rights under the Agreement.

96.     During this time, MAA also hired an engineering firm to perform independent third-party testing on the valves. This testing confirmed that

[The Precision Flow System] works when air is in the system (as advertised). Some system [sic] are more efficient than other [sic] and even the efficient systems are inefficient at times. The device ensures that regardless of these inefficiencies, the meter reads will be at optimum efficiency (or more efficient with the greenvalve that without). This is why we saw some properties save 5% and some save as high as 40%.

In addition to the demonstrated savings that MAA had seen at its properties, the independent third party testing confirmed, or should have confirmed, the efficacy of the Precision Flow System.

**XII.    MAA's Executives and Board of Directors Shirk Their Responsibilities and Conduct No Investigation**

97.     In January 2015, Fluid sent a letter detailing the conflict of interest and fraud propounded by James Maclin, Eddie Moore, and by extension, MAA on Fluid Dynamics and MAA's shareholders. That letter, with supporting exhibits, laid out the numerous conflicts and lack of board and executive leadership which had led to MAA's breach of the Agreement. Fluid heard nothing in response.

<u>COUNT I</u>
**Violation of Racketeer Influenced & Corrupt Organizations Act ("RICO")
Section 1962(c)**

98.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

99.     MAA is an enterprise engaged in and whose activities affect interstate commerce. The Defendant(s) are employed by or associated with the enterprise.

100.     Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

    a.   MAA refused to do business with Fluid unless Fluid partnered with Moore; thereby coercing Fluid into entering into a sales representation agreement with Moore;

    b.   MAA allowed Fluid to  (1) make Moore part of its senior management team, (2) give Moore a sales commission agreement for selling its product, and (3) have Moore act as the lead negotiator in negotiating Fluid's contract with MAA on Fluid's behalf, all while Moore was also working for MAA;

    c.   Moore disclosed Fluid's internal, confidential information to MAA to undermine Fluid's negotiation position with MAA, even while Moore was ostensibly acting on behalf of Fluid;

    d.   Moore negotiated a sharing savings plan, which gave Moore's  company, Olive Branch Consulting, a significant share of payout resulting from the cost savings

MAA expected to experience from the relationship with Fluid;

e. MAA's other executives, Eric Bolton and Thomas Grimes, and MAA's Board, NAMES, turned a blind eye to the obvious conflict of interest in Maclin's involvement with Olive Branch Consulting and Moore;

f. By not satisfying their duties under MAA's charter and Board's founding documents, MAA's Board allowed MAA's employees to defraud Fluid and to destroy Fluid's business and thus causally also destroying Hydro's business as well;

g. Later, once MAA's properties were seeing significant savings on their water bills, Fluid was receiving payments, and Fluid was paying Olive Branch, MAA and Moore "upped the ante" by demanding that Fluid amend its original agreement to give Olive Branch an additional 1.5% commission for any deals that MAA helped to close. MAA withheld an endorsement for a Fluid advertisement for a multi-family housing show in Las Vegas; making its endorsement dependent on a signed agreement granting Olive Branch Consulting a 1.5% commission.

h. Once that additional commission structure was in place, MAA fed Moore confidential information, in order to give Moore an unfair competitive advantage, and thus to help Mr. Moore close deals and earn the resulting commission.

i. MAA continued its pattern of deceit when JEA made false allegations of meter tampering as a result of the installation of Fluid's valve on MAA properties in Jacksonville, Florida. JEA realized that the Fluid valve had actually reduced the amount of money MAA was paying the utility to the City of Jacksonville, so the City came looking for money to fund its unfunded pension program.

j. JEA, with MAA's full cooperation, began removing the valves from the MAA properties in the City of Jacksonville and not removing the valves and instead keeping, destroying, selling, or otherwise disposing of Fluid's valves;

k. JEA falsely represented to Fluid that there was a cease and desist order preventing any valve reinstallations in Florida. MAA forwarded the requirements laid out by JEA to Fluid, and noted that the cease and desist order would have to be resolved prior to any reinstallations. This fallacy was quickly rebutted by Fluid.

l. While MAA falsely represented to Fluid that its position was that the calibration system is installed legally and on MAA property, behind the scenes it was scheming to bolster its relationship with JEA to further its other business interests. In fact, at one point, MAA's PR specialist told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on.

m. While MAA had evidence that the valves were effective, and Fluid was working in good faith to cure any issues with the installations, MAA had no intention of

permitting Fluid to reinstall the valves on its properties, regardless of the steps that Fluid took to cure any issues.

n.   MAA abruptly and unilaterally terminated its Master Valve Lease Agreement with Fluid.

o.   Fluid, unaware that MAA was colluding with JEA and had already made its decision to terminate the Agreement, at least a day before, was diligently working to make things right with both JEA and MAA.  Believing that it had the contractual right to cure any curable issues, Fluid engaged in the necessary steps to "cure" JEA's concerns, even though Fluid did not agree that there was a problem. So while Fluid was in good faith diligently (and "persistently") working to cure any problems with the installations, reinstall, and continue with the parties' Agreement, MAA was dragging its feet, with no intention of actually continuing the relationship;

p.   MAA and JEA, in support of other development projects in which the two entities were engaged, decided they would rather destroy Fluid's business than jeopardize their relationship.

101.   Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of extortion, retaliation, and fraud.

102.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

103.   Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

104.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in that: Fluid's value as a business has dropped from $50,000,000 to a fraction of that amount; Fluid's customers withdrew from contracts just before signing; Fluid's customers were no longer interested in Fluid's products after the Defendants made the above false statements and representations. All of these actions in turn damaged Hydro independent of the damage done to

Fluid.

## COUNT II

**Violation of Racketeer Influenced & Corrupt Organizations Act ("RICO")
Section 1962(d)**

105.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

106.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. §§ 1962 (c).

107.    The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed or acquiesced to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962 (c), in violation of 18 U.S.C. § 1962(d).

108.    As a direct and proximate result of the Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that:

   a.    Fluid's value as a business has dropped from $50,000,000 to a fraction of that amount; Fluid's customers withdrew from contracts just before signing; Fluid's customers were no longer interested in Fluid's products after the Plaintiff made the above false statements and representations. All of these actions in turn damaged Hydro independent of the damage done to Fluid.

## COUNT III

### Fraud

109.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

110.    Each of the Defendants made the above detailed representations to Plaintiff. These representations were of past or existing fact and included, but were not limited to, the following:

    a.  MAA and Moore had a pre-existing or subsequent and ongoing business association, all the while Moore was acting as a purported agent of Fluid in its dealings with MAA;

    b.  After strong-arming Fluid to increase the sales commissions paid to Olive Branch, MAA fed Moore confidential information, in order to give Moore an unfair competitive advantage, and thus hopefully to help Mr. Moore close deals and earn the resulting commission;

    c.  JEA falsely represented to Fluid that there was a cease and desist order preventing any valve reinstallations in Florida. MAA conspired to create this fiction by repeating the allegations laid out by JEA to Fluid, and noted that the cease and desist order would have to be resolved prior to any reinstallations.

    d.  MAA represented to Fluid that its position was that the calibration system is installed legally and on MAA property, behind the scenes it was scheming with JEA to bolster its relationship with JEA to further its other business interests. In fact, at one point, MAA's PR specialist told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on.

    e.  MAA had evidence that the valves were effective, and Fluid was working in good faith to cure any issues with the installations, MAA had no intention of permitting Fluid to reinstall the valves on its properties, regardless of the steps that Fluid took to cure any issues.

    f.  MAA then abruptly and unilaterally terminated its Master Valve Lease Agreement with Fluid.

111.    Each Defendant knew that these representations were false when made or made these representations recklessly without knowing whether they were true or false. Each Defendant intended that Plaintiff relied on these representations to act or not act in reliance on

them. In particular, MAA was well aware that Fluid was in good faith diligently (and "persistently") working to cure any problems with the installations, reinstall, and continue with the parties' Agreement, while it was colluding with JEA and planning to terminate its contract with Fluid. MAA knew that the Valves installed on residential water lines posed no threat to safety of its residents by its actions against Fluid, the Defendants knew or should have known that the Hydro would also be damaged.

## COUNT IV

### Intentional Interference with a Business Relationship

112.   Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

113.   Plaintiffs have a prospective/future business relationship with Fluid and the multi-family housing market nationwide.

114.   The Defendants have specific knowledge of the Plaintiff's prospective relationships with Fluid and future customers in the multi-family housing market nationwide.

115.   The business relationship and/or the prospective business relationship between the Plaintiffs and Fluid, as well as, the multi-family housing market has been diminished by the Defendants' conduct.

116.   The Defendants intentionally, and by improper motives, caused the relationship between Fluid, Plaintiff and the multi-family housing market to end and/or be diminished as a result of the unlawful and ongoing deliberate conduct.

## COUNT V

### Continuing Civil Conspiracy to Commit Unlawful Acts Forming the Basis for Counts I -IV & VI

117.   Plaintiff incorporates all allegations contained in the preceding paragraphs as if

fully set forth fully herein.

118.     Each Defendant entered into a tacit agreement of common design to defraud Plaintiff and to engage in conduct that forms the basis of all causes of action in Counts I – IV & VI alleged in herein. Specifically, Defendants' common purpose was *to obtain Plaintiff's money and imprimatur from Defendant's use of the Valve by unlawful means* as alleged in detail herein.

119.     Defendants' conspiracy and inter-corporate conspiracy was continuing in nature, with each Defendant making and continuing to engage in overt acts in furtherance of the conspiracy beginning in 2011 and going through 2014.

120.     Defendants' continuing conspiracy and inter-corporate conspiracy has proximately caused Plaintiff to sustain liquidated damages in the amount of approximately $1,000,000.00.

## COUNT VI

### Punitive Damages

121.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

122.     Each Defendant alleged herein acted intentionally and/or recklessly with respect to their wrongful conduct because they were aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiff by convincing Fluid to permit the manufacture, installation of and use the Valve under false pretenses. As a result, each Defendant's actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

123.     With respect to the applicable factors that may be addressed by the fact finder

when determining punitive damages, Plaintiff would allege as follows:

124.    The nature and reprehensibility of Defendant's wrongdoing is substantial because Defendants intentionally or recklessly lied to Plaintiff and to Fluid.

125.    Defendants were aware of the harm that could and would be caused to Plaintiff with respect to their wrongful conduct;

126.    Defendants' conspiracy and fraud was continuing in nature and spanned several years;

127.    In order to recover its losses, Plaintiff will incur substantial costs, including attorney's fees;

128.    Defendants profited significantly from the money they received from their fraudulent scheme and a significant punitive award is the only method to deter future similar misconduct.

129.    Based upon the above allegations and factors, Plaintiff would respectfully request the entry of a punitive award in an amount to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, jointly and severally against each of the Defendants on each Count of the Complaint and the following relief:

a.      Issue service of process and serve each Defendant not otherwise a party; Grant any reasonable request to Amend Plaintiff's Complaint to conform to the discovery and evidence obtained in this action;

b.      Award Plaintiff liquidated compensatory damages in an amount not less than $1,000,000.00;

c.      Award punitive damages against each Defendant as determined by the trier of

fact;

    d.    Award pre-and post-judgment interest in the amount of 10% per annum pursuant to TENN. CODE ANN. § 47-14-123 in amount according to the proof at trial;

    e.    Award costs and expenses incurred in this action pursuant to Rule 54.01 of the Tennessee Rules of Civil Procedure;

    f.    Award pre-and post-judgment interest as provided by law in amount according to proof at trial; and

    g.    Grant Plaintiff such further relief as the Court may deem just and proper.

Respectfully Submitted By,

**LAW OFFICE OF EDWARD M. BEARMAN**

EDWARD M. BEARMAN (#14242)
780 Ridge Lake Boulevard, Suite 202
Memphis, Tennessee 38120
(901) 682-3450
(901) 682-3590 – Fax
ebearman@jglawfirm.com

GARY E. VEAZEY (#10657)  by EMB
*Attorney for Petitioner*
780 Ridge Lake Boulevard, Suite 202
Memphis, Tennessee 38120
(901) 682-3450 – Phone
(901) 682-3590 – Fax
gveazey@jglawfirm.com

ELECTRONICALLY FILED
2017 Jun 21 PM 1:12
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

HYDRO DYNAMICS, LLC,

     Plaintiff,

v.

MID-AMERICA APARTMENTS, L.P., H. ERIC BOLTON, JR.,
THOMAS L. GRIMES, JR., JAMES MACLIN, AL GRAFF, JR.,
GARY SHORB, D. RALPH HORN, WILLIAM B. SANSOM,
PHILLIP NORWOOD, W. REID SANDERS, CLAUDE B.
NEILSON, individually and in their capacity as officers and
directors of MAA, and EDWARD MOORE,

     Defendants.

## HYDRO DYNAMICS, LLC'S COMPLAINT AGAINST MID-AMERICA APARTMENTS, L.P., H. ERIC BOLTON, JR., THOMAS L. GRIMES, JR., JAMES MACLIN, AL GRAF, JR., GARY SHORB, D. RALPH HORN, WILLIAM B. SANSOM, PHILLIP NORWOOD, W. REID SANDERS, CLAUDE B. NEILSON AND EDWARD MOORE

**COMES NOW** Plaintiff, Hydro Dynamics, LLC (hereinafter "Hydro") by and through

counsel, hereby files this Complaint against Defendants Mid-America Apartments, L.P.

(hereinafter referred to as "MAA"), H. Eric Bolton, Jr, Thomas L Grimes, Jr., James Maclin, Al

Graff, Jr., Gary Shorb, D. Ralph Horn, William B. Sansom, Phillip Norwood, W. Reid Sanders,

Claude B. Neilson and Edward Moore (collectively "Defendants") as follows:

### NATURE OF THE DISPUTE

1.     The dispute at the heart of this Complaint relates to MAA's breach of a fifteen-

year contract with Fluid Dynamics, a company formed to market nationally the water-saving

valves manufactured by Plaintiff Hydro Dynamics, LLC. MAA's fraud, extortion, and tortious

interference have turned a simple breach of contract case into a fragmented dispute that is being

heard in Florida state court, AAA arbitration, and now in Tennessee state court. As a result of MAA's actions, detailed below, Plaintiff Hydro Dynamics has suffered independent but related damages and therefore seeks compensatory damages, treble damages, punitive damages, declaratory and injunctive relief, and pre- and post-award interest.

## THE PARTIES

2.      Plaintiff Hydro Dynamics, LLC, is a limited liability corporation formed under the laws of the state of Delaware, with its principal place of business at 2275 Biscayne Boulevard, Miami, Florida 33137. At all relevant times, Hydro Dynamics, LLC was the manufacturer and producer of the water-saving valves at the heart of this dispute. Also at all relevant times, Hydro Dynamics was managed by Fluid Dynamics Holdings, the company formed by defendants Gary Waxman and Jeffrey Weiner.

3.      H. Eric Bolton, Thomas Grimes and James Maclin are or were officers of MAA and at all times herein were parties to the acts and causes of action alleged herein individually and/or in their capacity as agents for MAA.

4.      The following Directors of MAA are alleged to have participated in the schemes perpetuated on Plaintiff or ignored their duty upon notice to stop these schemes and thus have acted outside the scope of their duties and have failed in their individual capacity or their capacity as directors which has harmed Plaintiff:

- Al Graf, Jr.

- Gary Shorb

- D. Ralph Horne

- William B. Sansom

- Phillip Norwood

- W. Reid Sanders

- Claude B. Neilson

5.     Edward Moore is a Defendant who upon information and belief, participated in the predicate RICO actions as indicated below. As a co-conspirator, Mr. Moore has subjected himself to the jurisdiction of this court.

## BACKGROUND FACTUAL ALLEGATIONS

### I.     Fluid Is Formed to Develop a Business to Market and Lease the Valve

5.     In late 2010, Gary Waxman and Jeffrey Weiner started Fluid Dynamics Holdings ("Fluid") to market and lease water savings valves manufactured by Hydro Dynamics ("Hydro").

6.     Under that leasing model, Fluid would install the valves at no cost to the customer in exchange for a percentage of the customer's savings on their water bill created by the valve.

7.     Fluid actively solicited business in the multi-family housing market.

### II.     Fluid Secures MAA, One of the Top Twenty Multi-Family Apartment Building Owners, As A Customer

8.     In April 2011, as part of Fluid's outreach to many potential large-water-usage clients, Fluid made its first contact at Mid America Apartments ("MAA") with a phone call to Thomas Grimes, MAA's COO.

9.     To follow up on the phone call, Mr. Ward sent three emails to Mr. Grimes attaching a series of technical reports detailing the workings and certifications for Fluid's product. Those reports included:

- a "Practical Field Report," which discussed how the valve "regulates the flow of water";

- an Engineering Laboratory Test Report from NSF International, which discussed how the valve reduced test air flow by thirty-eight percent (38%), among other things;

- a white paper by Dr. Héctor Guevara titled "Controlling water flow speed and volume by using a smart valve control node at meter egress point";

- a copy of the filing receipt for Mr. Barreda's then-pending patent on the valve; a one-page informational diagram and installation instructions;

- a certification of secondary review by an engineering company of the white paper by Dr. Guevara; and

- a series of certifications from IAPMO Research and Testing, a product certification company, certifying that the valve was safe to be used with drinking water.

10.     In early June 2011, when Fluid followed up again with MAA, Mr. Grimes asked that the background materials above be sent to James Maclin, MAA's Senior Vice President in charge of utility billing.

11.     When Mr. Maclin received the attachments above, he forwarded them on to his deputy, Brandon Whitmire and asked him to do some research into Fluid.

### III.   MAA's Senior Vice President, James Maclin, Saw an Opportunity to Take Advantage of MAA's Position of Economic Power to Make Money for Himself and His Friends

12.     In September 2011, MAA was equivocating on its interest in the valves when, out of the blue, Mr. Maclin notified Fluid that it was interested in the valves and that "MAA would really like to take this opportunity to increase its minority partnerships thru Imani Environmental Group, Inc,. The contact/owner is Mr. Eddie Moore. . ." Imani was a predecessor to Olive Branch Consulting.

13.     Unbeknownst to Fluid, immediately before sending that e-mail to Mr. Ward, Mr. Maclin reached out to Edward ("Eddie") Moore, his college football buddy, saying: "I just talked to the lead guy with Fluid Dynamics. ...he is aware of MAA's need for minority partnership involvement." This fact was only recently discovered through discovery in a related action.

14.     When Fluid questioned and pushed back on the need for Mr. Moore's involvement, Mr. Maclin withdrew his interest in contracting with Fluid: "it does not seem like

there is an opportunity for MAA but we are going to review again with our consultants and lawyers."

15.     Fluid continued to pursue MAA and began discussions with Mr. Moore for him to be a sales representative of Fluid.

16.     As part of those discussions, Mr. Moore visited Fluid's manufacturing factory run by Hydro, and met with Mr. Waxman.

17.     Fluid eventually accepted Mr. Maclin's message, which was communicated as an absolute requirement, that if Fluid wanted to work with MAA, it would have to partner with Mr. Moore.

18.     In mid-November 2011, Fluid began to finalize a sales representation agreement with Mr. Moore.

19.     Immediately after Fluid and Mr. Moore's relationship began to solidify, MAA became interested in the valve again and Mr. Maclin asked for a draft agreement, which Fluid provided.

20.     Fluid has now learned that, behind the scenes, Mr. Moore and Mr. Maclin had already been colluding to insert Mr. Moore into the Fluid-MAA relationship so that both would make money.

21.     Fluid embraced Mr. Moore's involvement – not realizing he was a plant for MAA – making him part of the senior management team, giving him a sales commission agreement, and asking him to engage MAA as the lead negotiator.

22.     MAA and Fluid entered into vigorous discussions, with Mr. Moore taking the lead for Fluid on many important aspects of those negotiations.

23.     Among other things, Mr. Moore 1) negotiated the savings sharing plan, which

gave Mr. Moore's company, Olive Branch Consulting, a significant share of the payout resulting from the cost savings MAA expected to experience; and 2) coordinated a pilot program for testing the efficacy of the valves.

24.     MAA's willingness to give Olive Branch Consulting a significant share of the cost savings that would have otherwise gone to MAA was surprising at the time; although Mr. Maclin assured Mr. Waxman that everything was above board.

25.     Fluid has since learned that the arrangement was a canard designed to make Mr. Moore money to the detriment of MAA and its shareholders and in direct conflict of interest to Fluid.

26.     Mr. Moore was on MAA's payroll the entire time he was conducting what appeared to be his own due diligence as a "water expert" and even while he was on Fluid's senior management team negotiating Fluid's contract with MAA on Fluid's behalf.

27.     MAA's payments to Mr. Moore continued through January 2014, even after MAA had allegedly (much later) disavowed a partnership with Olive Branch Consulting.

28.     Fluid has not been able to see Mr. Moore's, Olive Branch's, or Mr. Maclin's bank records, which may show how the money flowed between Mr. Maclin and Mr. Moore.

29.     As part of the transfer of benefits from MAA to Olive Branch Consulting and back to Mr. Maclin, Mr. Moore sold a 1971 Chevelle, a classic muscle car, to Mr. Maclin for significantly less than the car's true worth.

## IV.   MAA's Chief Executive, Chief Operating Officer, and Board of Directors Turn a Blind Eye to MAA's Conflict of Interests

30.     MAA essentially let Mr. Maclin have complete control over the negotiations with Fluid, with no oversight.

31.     Neither of Mr. Maclin's supervisors, Mr. Grimes or Drew Taylor, were involved

in the negotiations beyond introducing Mr. Maclin to Fluid. Nor did Mr. Bolton, MAA's CEO, or Mr. Grimes, its COO, approve the contract before Mr. Maclin signed it on behalf of MAA. Neither was even aware of the first contract when it was signed. When Mr. Maclin signed the contract with Fluid, MAA corporate policy prohibited him from doing so. Neither Mr. Grimes nor Mr. Bolton adhered to this policy.

32.     MAA's Board of Directors did not conduct any due diligence or approve the Fluid Agreement before it was signed.

**V.     MAA and Fluid Sign a Fifteen Year Deal to Install Fluid's Valves and Share the Resulting Savings**

33.     In December 2011, MAA and Fluid reached final agreement on a Master Valve Lease Agreement ("the Agreement").

34.     Mr. Maclin inserted a "minority participation program" and a "savings sharing plan" that divided the savings on MAA's water bills between MAA, Fluid Dynamics, and Olive Branch Consulting. MAA did not have a formal "minority participation program" and did no due diligence before contracting with Olive Branch Consulting and Mr. Moore. Indeed, no one other than Mr. Maclin knew of Olive Branch Consulting's or Mr. Moore's inclusion of the contract until approximately one year later when MAA's internal audit discovered their inclusion.

35.     Due to the immediate success of the initial installations, MAA asked Fluid to install the valve on all of MAA's remaining properties.

36.     By October 24, 2012, the valves had been installed, and were saving water, on at least seventy-six MAA properties.

37.     The first property on which the valves were installed has become a poster-property for the value of the valves manufactured by Hydro and marketed by Fluid. Not only did the valves save MAA significant amounts of money, but when the property was sold, the new

owner maintained the valve and the property's agreement with Fluid and has saved significantly on monthly water bills.

## VI. MAA Closely Supervises Installation of Valves on Its Properties, Insisting on Approving All Plumbers, and Monitoring Permitting and Interactions with Local Authorities.

38.     MAA through its SVP, Director of Corporate Services, Mr. Maclin, were actively engaged throughout the installation process in all of its properties. In the beginning, Mr. Maclin developed the installation plan for all of the valves under which Fluid or its associated companies would install the valves on MAA's properties.

39.     The plan was to install calibration systems throughout the entire MAA portfolio in less than a year. This was to be accomplished through a three-phase installation, with each phase covering several states. Each of the phases was to include a Request for Proposal ("RFP") process, which would represent a survey to assess water system, determine a number of meters, their locations, types and size of water lines.

40.     Mr. Maclin's engagement with the installation process continued throughout Fluid's relationship with MAA. Mr. Maclin actively assisted Fluid in developing the employee manual to train the individuals who were installing the valves.

41.     MAA was also responsible for securing cooperation with the water utility when necessary. Mr. Maclin was the primary contact for property managers to gather information about water lines to determine which meter vaults are locked. Mr. Maclin asked all of his property managers to submit Inspection Forms detailing the results of their survey.

42.     The information obtained from the property managers was then used to coordinate efforts contacting the utility companies to open the vaults for assessment and installation.

43.     Mr. Maclin was responsible for instructing property teams to contact utilities and unlock the meters.

44.     When meter vaults or meter themselves were broken, Mr. Maclin was in direct contact with utility companies and cities to repair them prior to installation of Fluid's calibration devices.

45.     MAA, through Mr. Maclin, took an active, if not leading, role in the process of assessing the water systems prior to each and every installation.

46.     MAA's control over the installation process extended to telling Fluid on which lines it should install its valves. For example, in September 2012, Mr. Maclin instructed Fluid to install on a combination line – a line serving both residential water usage and fire suppression systems – if the line was actually "material in usage."

47.     At the end of the day, MAA knew exactly where every single Fluid device was installed and on which type of line it was installed. Indeed, Mr. Maclin, as the agent of the property owner, exercised ultimate authority over MAA's property.

48.     Fluid was instructed to listen to the property manager's instructions. Mr. Maclin made clear, not only did the property owners know their properties best, including what types of water lines they had, but the property owners were "accountable for everything on the property."

49.     Not only did MAA take control and oversight of which water lines should receive a Fluid valve, Mr. Maclin managed and oversaw Fluid's retention of plumbers and procurement of permits.

50.     MAA also instructed Fluid that plumbers were not always necessary for each installation and directed Fluid as to which properties it wanted to have plumbers take care of the installation and at which it did not.

51.     Fluid and MAA were engaged in almost daily discussions on the progress. In addition to updates before and during every installation, Fluid and MAA exchanged a profuse

number of emails upon completion of the installations to update MAA on installations attaching reports that showed which line received a valve and associated meter numbers.

52.     MAA also controlled the overall progress of the project. Mr. Maclin established that the valves would be installed on all of MAA's properties at the time in three main phases. Mr. Maclin dictated how many installations could be performed weekly and which plumbers would be used onsite.

53.     One of the justifications Mr. Maclin gave for Mr. Moore's involvement with the installation process was that, as a "water expert," Mr. Moore would be able to manage the valve's installation and ensure that it was done correctly. Documents show that before Mr. Maclin called Fluid to hire Mr. Moore "to coordinate and get us thru [the] test" in February 2012, Mr. Maclin was already consulting with Mr. Moore on the plumbers issue and having Mr. Moore (not Fluid) contact plumbers for the upcoming RFPs in October-December 2011 and first installations in January and February 2012.

## VII.     James Maclin agrees to endorse Fluid's valves in exchange for Eddie Moore receiving a percentage of all future Fluid leases.

54.     By July 2012, MAA's properties were seeing significant savings on their water bills, Fluid was receiving payments, and Fluid was paying Olive Branch. Hydro was also receiving the benefit of manufacturing more valves.

55.     Mr. Maclin used his position within MAA to feed Mr. Moore confidential information to give Mr. Moore an unfair competitive advantage, and thus hopefully to help Mr. Moore close deals and earn the resulting commission. For example, in July 2012, Mr. Maclin sent Mr. Moore confidential information about a property MAA was selling; a property that did not yet have a valve installed. Despite the fact that vendors were not supposed to contact the buyer until after closing, Mr. Maclin sent Mr. Moore the property's details with a veiled

message: "FYI...buyer of one of our properties in Atlanta...but NOT currently in the GreenValve program. Just an FYI."

## VIII.   MAA, Mr. Maclin, Olive Branch Consulting, and Mr. Moore enter into an enterprise to extort money from Fluid

56.     Sometime around July 2012, Mr. Maclin appears to have recognized that his endorsement of the valve would carry tremendous weight and would help Fluid make a lot of money. But simply giving his endorsement would not enrich Mr. Maclin or Mr. Moore and so he and Mr. Moore set out to capitalize on their position.

57.     First, Mr. Maclin and Mr. Moore needed to ensure that Olive Branch Consulting would receive a percentage of all new leases in the multi-family residential housing industry. To that end, Mr. Moore approached Fluid in August 2012 requesting a 1.5% commission for *Olive Branch Consulting* for any deals that *MAA* helped to close.

58.     Fluid was initially very skeptical – it made no sense for Olive Branch Consulting to get a financial benefit for deals with other parties that MAA helped to close.

59.     To push Fluid into accepting the deal with Olive Branch, Mr. Maclin increased the pressure. Mr. Maclin made his endorsement of Fluid's valves dependent on a signed agreement granting Olive Branch Consulting a 1.5% commission.

60.     Fluid realized the opportunity to get MAA's endorsement was too valuable to pass and accepted Mr. Maclin's offer. The agreement with Mr. Moore was signed on September 14, 2012. MAA and Olive Branch released Mr. Maclin's endorsement that same day.

61.     Mr. Maclin kept his side of the bargain, for a time. A few days later, Mr. Maclin proposed different types of testimonials he could provide; Mr. Moore wanted all three. Mr. Maclin even went out of his way to proactively invite potential customers to view installations.

62.     Mr. Maclin's endorsement was distributed to hundreds of multi-family housing

property managers at Mr. Maclin's insistence. His endorsement had an immediate effect such that many new potential clients contacted Fluid and MAA to get involved in the program.

63.    The anticipated increase in demand would have brought Hydro a significant financial benefit for its part in manufacturing the valves.

64.    Second, Mr. Maclin needed to increase Fluid's exposure. While Mr. Moore and Mr. Maclin were maneuvering to get Olive Branch Consulting a commission on all sales, Mr. Maclin invited Fluid to an upcoming multi-family housing conference in Las Vegas. Mr. Maclin knew that Fluid would jump at the opportunity and that his endorsement in that community would be as good as gold. He then went out of his way to use his role within MAA to drive business to Fluid and thus to Hydro and to assist Mr. Moore in building contacts to increase Mr. Moore's commissions.

## IX.    After the Fluid valves prove to save MAA significant amounts of money, JEA Makes Spurious Claims of Illegal or Unsafe Valve Installations and a Malicious Pledge from JEA to Force Removal of Every Valve in Jacksonville, Regardless of Placement.

65.    In Fall 2012, JEA began to notice that some of its top revenue producing water meters were producing significantly less revenue. In their investigation they noticed a correlation between properties with the valves and decreased revenue.

66.    On November 15, 2012 – despite the fact that as early as July 2012 JEA was fully aware that MAA was installing Fluid's valves on MAA's properties in Jacksonville, had opened meter vaults for Fluid's inspection, and had been to at least one of MAA's properties to inspect those installations – JEA contacted MAA claiming it had discovered valves installed in violation of municipality rules.

67.    At first MAA's response to JEA's assertion was "that the calibration system is installed legally and on MAA property." But MAA's support diminished quickly and without a

reasonable or understandable basis.

68.     JEA took an aggressive and threatening approach with MAA. In November 2012, JEA contacted a property manager at Woodhollow, expressing concerns about media coverage "statewide" regarding the installation of the valves and threatening "to make an arrest [of] the folks at Precision" (Precision references Fluid) At that point no media coverage had occurred and would not occur for another almost three weeks.

69.     Days after it first notified MAA of its concerns, JEA had taken matters into its own hands. MAA informed Fluid that JEA believed the "calibration systems are install[ed] on fire lines and [are] hurting flow and [are] putting MAA residents at risk" and that JEA was "in the process of removing the calibration system."

70.     Fluid tried to resolve issues with JEA and MAA and was told everything was fine and that the parties could all work together. MAA and JEA told Fluid that device removal would be put on hold while the parties discussed how to proceed.

71.     A meeting between JEA, MAA, Fluid, the City of Jacksonville ("COJ"), and the Jacksonville Fire and Rescue Department ("JFRD") was set for December 3, 2012.

72.     While waiting for the December 3 meeting to occur, however, JEA and MAA did not stand down as they promised they would. Instead, they continued to remove valves that they claimed were installed on water lines – called combination lines – that provide water for both fire safety and general residential use.

73.     Fluid continued to engage JEA proactively to address its concerns. In late November 2012, Fluid informed Mr. Maclin that "[a]t its own cost, Fluid Dynamics is willing and ready to remove the calibration system . . . . If required, JEA personnel can certainly attend and oversee this removal at a mutually convenient arranged time."

74.     But JEA and MAA refused to accept Fluid's offers, citing "meter tampering" as the reason why Fluid could not remove the valves itself despite its contractual right to do so.

75.     On December 3, 2012, Fluid met with JEA, City of Jacksonville, Jacksonville Fire Department ("JFRD"), and MAA concerning the valves. Fluid walked away from that meeting with the impression that it had made inroads with the Jacksonville agencies concerning the valves and that all parties would work together to assist Fluid and MAA with performance of the parties contract.

76.     On or about December 4, 2012, however, JEA's spokesperson spoke to reporters at ActionNews and First Coast News in Jacksonville and brought to their attention JEA's allegations of meter tampering and the safety of the valves.

77.     Around the same day, a reporter from First Coast News in Jacksonville, Florida, called Mr. Maclin for his comment on the JEA's investigation of "meter tampering" on MAA's properties in Jacksonville. Mr. Maclin did not repeat his internal "talking points" which defended MAA's use of the valve and ensured the public that the valve was tested and safe, but instead acquiesced to JEA's pressure and indicated a mutual respect for its partnership with JEA without mentioning Fluid's cooperation and desire to resolve the issues with both JEA and MAA.

78.     That evening the First Coast News aired its story concerning the valves. That story painted a dooms day possibility of people's lives and property in jeopardy in case of fire due to the installation of the valves. The story also suggested that persons could be sick from drinking water from lines where the valves were installed. In addition, JEA accused "Precision Flow" of meter tampering, trespassing, and installing the valves illegally because it had not pulled permits.

79.     Throughout this period Fluid was actively engaged in attempting to cure any real

problems and counter the false allegations.

80.     Fluid hired a licensed fire sprinkler system inspector to perform the testing requested by MAA and sent to Mr. Maclin and the JFRD the positive results showing that the valves were not affecting firefighting capabilities and the locations were "in good working order" the next day on December 6.

81.     Meanwhile JEA and MAA continued their media attack on Fluid and the valves by sending to First Coast News an email:

> This device acts as a restrictor and significantly reduces flow rate. The consequences our ongoing investigation has [sic] uncovered are:
>
> 1. Reduced flow alters the original fire protection design and is a safety concern.
> 2. The flow restriction on the low side of the large meters, diverts the water to the large side of the meter. At medium flow rates, the large side cannot measure this flow, affecting accuracy of the meter.

82.     On or about December 6, 2012, MAA lobbyist reported that based on his call with the Jacksonville Fire Marshal, COJ "is going to be very reasonable and will follow JEA [sic] lead" and that the Fire Marshal "just wants documentation that [the valves are ]not on fire lines or shared lines until technology is proven." Importantly, the Fire Marshal also stated that he "[did] not care if PF is on dedicated water only lines, will leave that to JEA." While the Fire Marshal continued to believe that the valves restricted flow in a way that would affect fire hydrants, he remained "open to further tests" to verify the accuracy of his concerns.

## X.    MAA Makes the Calculated Decision to Repudiate Its Fifteen Year Contract with Fluid, and Proceeds to Remove the Precision Flow System from Every Property in Every State, in Blatant Breach of Its Contract with Fluid.

83.     Faced with JEA's ire, MAA decided it would rather breach its contract with Fluid than jeopardize its relationships with JEA and the City of Jacksonville.

84.     MAA directed its lobbyist to inform JEA that it would be removing all of the

valves from all of MAA's properties across its portfolio, not only from the Jacksonville properties.

85.    Sometime on or about December 6, 2012, MAA's lobbyist called Jim Dickenson (the CEO of JEA) to discuss MAA's concern about "JEA's media response on the Mid-America issue"; specifically, that JEA "took a negative position with the media vs [how it] positioned [itself] in the meeting that was held" on December 3. That call from Mr. Diebenow, a Lobbyist for MAA, prompted Mr. Dickenson to contact JEA's Vice President of Customer Relations and demand that she call Mr. Diebenow to address Mr. Diebenow's concerns.  After JEA's Vice President's call to Mr. Diebenow, Mr. Diebenow forwarded to JEA's Vice President an email highlighting JEA's problematic media statements in the ActionNews story.

86.    Shortly after JEA's Vice President challenged JEA's policy, she was fired.

87.    Meanwhile, MAA's lobbyist represented to Fluid that everything was going well with the Fire Marshal and JEA, while giving no clue to Fluid that MAA had already decided to remove the valves from all of its properties.

88.    Just before noon that same day, minutes after Mr. Diebenow had told Fluid it was working on a "collaborative" relationship, MAA delivered the fatal blow to Fluid and therefore Hydro. In an email from Mr. Maclin to Mr. Weiner and Mr. Waxman, MAA unilaterally terminated the Master Valve Lease Agreement:

> Due to recent findings by JEA, the Jacksonville Fire Department and Fire Marshal that the calibration systems pose a life threatening risk to our customers, MAA is in the process of removing all of the calibration systems throughout all of MAA's properties."

89.    Shortly after notifying Fluid that it had terminated the Master Valve Lease Agreement, MAA sent an email to JEA giving "MAA's authorization for the **JEA to remove <u>all</u> Precision Flow devices from MAA's property in Jacksonville, Florida.**"

90.    MAA's public relations team did not hesitate in releasing news of its decision to pull the valves and did not hedge in its acquiescence to JEA's unfounded allegations. In a media statement drafted the same day for MAA's residents, MAA wrote:

> *After detailed conversations with the Jacksonville Electric Authority (JEA), the Fire Department and the Fire Marshal,* Mid America Apartments is in the process of having all the Precision Flow systems from our Jacksonville communities removed. *These agencies had several questions and concerns about the Precision Flow devices, so out of an abundance of caution,* we decided to take these systems out of our communities until all concerns could be addressed.

91.    For Fluid's part – several hours before MAA had given notice to Fluid of its repudiation – Fluid drafted a strong and fact-filled press release to address the incorrect, unfounded, and negative media statements in hopes of mitigating the damage being done to fluid and Hydro. This was important to Fluid because MAA seemingly refused to counter JEA's claims publicly, even though MAA had already disavowed JEA's statements in emails to the JEA and internally. However, MAA's PR specialist, told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on. Still believing that all of the parties were working as partners in a collaborative stance, Fluid accepted MAA's direction. Fluid did not realize at the time that Mr. Finotti was not looking out for Fluid's interest and was ignoring the fact that the bad press would likely cause Fluid significant harm.

92.    Additionally, Fluid was diligently working to make things right with both JEA and MAA. Relying on its contractual right to cure any curable issues, Fluid engaged in the necessary steps to "cure" JEA's concerns, even though Fluid did not agree with them.

93.    Recognizing post-facto that no one had actually checked the veracity of JEA's claims, Mr. Davis, MAA's internal auditor, asked Mr. Grimes whether anyone had actually checked whether the problem was actually JEA's problem, not Fluid's.

I am interested in the plumbing work part because that implies the installation was faulty. Has anyone measured the water pressure since the valves were removed? … I was told that the reason JEA wanted to remove the valves was that the fire department measured the water flow with the devices on and found several properties with water pressure too low to fight fires. *I am asking whether anyone has checked to see if the low pressure was the valves or an inherent problem in the Jacksonville water delivery system.*

94.   Mr. Maclin responded only to point out that:

JEA's testing was done in there lab and not onsite. We have data on pressure before and after installed as measured by FD/PF. Since JEA's statements, we have been focusing on getting them removed and not proving the validity of the precision flow product. Other than JEA's concerns, we do not have any documentation of low flow and/or pressure.

## XI.   MAA Falsely Pretends That It Intends to Reinstall Fluid's Valves on Its Properties in An Attempt to Avoid the Consequences of Its Breach.

95.   In the months that followed that termination email, which MAA knew constituted a clear breach of the Agreement, MAA sought to avoid the consequences of its breach by leading Fluid to believe that MAA was interested in reinstalling the valves. While Fluid did not know it at the time, MAA's expressed interest in allowing Fluid to cure any breach was just a ruse designed to stave off Fluid's assertion of its rights under the Agreement.

96.   During this time, MAA also hired an engineering firm to perform independent third-party testing on the valves. This testing confirmed that

[The Precision Flow System] works when air is in the system (as advertised). Some system [sic] are more efficient than other [sic] and even the efficient systems are inefficient at times. The device ensures that regardless of these inefficiencies, the meter reads will be at optimum efficiency (or more efficient with the greenvalve that without). This is why we saw some properties save 5% and some save as high as 40%.

In addition to the demonstrated savings that MAA had seen at its properties, the independent third party testing confirmed, or should have confirmed, the efficacy of the Precision Flow System.

## XII.   MAA's Executives and Board of Directors Shirk Their Responsibilities and Conduct No Investigation

97.     In January 2015, Fluid sent a letter detailing the conflict of interest and fraud propounded by James Maclin, Eddie Moore, and by extension, MAA on Fluid Dynamics and MAA's shareholders. That letter, with supporting exhibits, laid out the numerous conflicts and lack of board and executive leadership which had led to MAA's breach of the Agreement. Fluid heard nothing in response.

### COUNT I
**Violation of Racketeer Influenced & Corrupt Organizations Act ("RICO")
Section 1962(c)**

98.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

99.     MAA is an enterprise engaged in and whose activities affect interstate commerce. The Defendant(s) are employed by or associated with the enterprise.

100.     Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

   a.   MAA refused to do business with Fluid unless Fluid partnered with Moore; thereby coercing Fluid into entering into a sales representation agreement with Moore;

   b.   MAA allowed Fluid to  (1) make Moore part of its senior management team, (2) give Moore a sales commission agreement for selling its product, and (3) have Moore act as the lead negotiator in negotiating Fluid's contract with MAA on Fluid's behalf, all while Moore was also working for MAA;

   c.   Moore disclosed Fluid's internal, confidential information to MAA to undermine Fluid's negotiation position with MAA, even while Moore was ostensibly acting on behalf of Fluid;

   d.   Moore negotiated a sharing savings plan, which gave Moore's  company, Olive Branch Consulting, a significant share of payout resulting from the cost savings

Page **19** of **27**

MAA expected to experience from the relationship with Fluid;

e. MAA's other executives, Eric Bolton and Thomas Grimes, and MAA's Board, NAMES, turned a blind eye to the obvious conflict of interest in Maclin's involvement with Olive Branch Consulting and Moore;

f. By not satisfying their duties under MAA's charter and Board's founding documents, MAA's Board allowed MAA's employees to defraud Fluid and to destroy Fluid's business and thus causally also destroying Hydro's business as well;

g. Later, once MAA's properties were seeing significant savings on their water bills, Fluid was receiving payments, and Fluid was paying Olive Branch, MAA and Moore "upped the ante" by demanding that Fluid amend its original agreement to give Olive Branch an additional 1.5% commission for any deals that MAA helped to close. MAA withheld an endorsement for a Fluid advertisement for a multi-family housing show in Las Vegas; making its endorsement dependent on a signed agreement granting Olive Branch Consulting a 1.5% commission.

h. Once that additional commission structure was in place, MAA fed Moore confidential information, in order to give Moore an unfair competitive advantage, and thus to help Mr. Moore close deals and earn the resulting commission.

i. MAA continued its pattern of deceit when JEA made false allegations of meter tampering as a result of the installation of Fluid's valve on MAA properties in Jacksonville, Florida. JEA realized that the Fluid valve had actually reduced the amount of money MAA was paying the utility to the City of Jacksonville, so the City came looking for money to fund its unfunded pension program.

j. JEA, with MAA's full cooperation, began removing the valves from the MAA properties in the City of Jacksonville and not removing the valves and instead keeping, destroying, selling, or otherwise disposing of Fluid's valves;

k. JEA falsely represented to Fluid that there was a cease and desist order preventing any valve reinstallations in Florida. MAA forwarded the requirements laid out by JEA to Fluid, and noted that the cease and desist order would have to be resolved prior to any reinstallations. This fallacy was quickly rebutted by Fluid.

l. While MAA falsely represented to Fluid that its position was that the calibration system is installed legally and on MAA property, behind the scenes it was scheming to bolster its relationship with JEA to further its other business interests. In fact, at one point, MAA's PR specialist told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on.

m. While MAA had evidence that the valves were effective, and Fluid was working in good faith to cure any issues with the installations, MAA had no intention of

permitting Fluid to reinstall the valves on its properties, regardless of the steps that Fluid took to cure any issues.

n.  MAA abruptly and unilaterally terminated its Master Valve Lease Agreement with Fluid.

o.  Fluid, unaware that MAA was colluding with JEA and had already made its decision to terminate the Agreement, at least a day before, was diligently working to make things right with both JEA and MAA.  Believing that it had the contractual right to cure any curable issues, Fluid engaged in the necessary steps to "cure" JEA's concerns, even though Fluid did not agree that there was a problem. So while Fluid was in good faith diligently (and "persistently") working to cure any problems with the installations, reinstall, and continue with the parties' Agreement, MAA was dragging its feet, with no intention of actually continuing the relationship;

p.  MAA and JEA, in support of other development projects in which the two entities were engaged, decided they would rather destroy Fluid's business than jeopardize their relationship.

101.   Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of extortion, retaliation, and fraud.

102.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

103.   Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

104.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in that: Fluid's value as a business has dropped from $50,000,000 to a fraction of that amount; Fluid's customers withdrew from contracts just before signing; Fluid's customers were no longer interested in Fluid's products after the Defendants made the above false statements and representations. All of these actions in turn damaged Hydro independent of the damage done to

Fluid.

## COUNT II

### Violation of Racketeer Influenced & Corrupt Organizations Act ("RICO") Section 1962(d)

105.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

106.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. §§ 1962 (c).

107.    The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed or acquiesced to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962 (c), in violation of 18 U.S.C. § 1962(d).

108.    As a direct and proximate result of the Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that:

  a.    Fluid's value as a business has dropped from $50,000,000 to a fraction of that amount; Fluid's customers withdrew from contracts just before signing; Fluid's customers were no longer interested in Fluid's products after the Plaintiff made the above false statements and representations. All of these actions in turn damaged Hydro independent of the damage done to Fluid.

## COUNT III

### Fraud

109.   Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

110.   Each of the Defendants made the above detailed representations to Plaintiff. These representations were of past or existing fact and included, but were not limited to, the following:

    a. MAA and Moore had a pre-existing or subsequent and ongoing business association, all the while Moore was acting as a purported agent of Fluid in its dealings with MAA;

    b. After strong-arming Fluid to increase the sales commissions paid to Olive Branch, MAA fed Moore confidential information, in order to give Moore an unfair competitive advantage, and thus hopefully to help Mr. Moore close deals and earn the resulting commission;

    c. JEA falsely represented to Fluid that there was a cease and desist order preventing any valve reinstallations in Florida. MAA conspired to create this fiction by repeating the allegations laid out by JEA to Fluid, and noted that the cease and desist order would have to be resolved prior to any reinstallations.

    d. MAA represented to Fluid that its position was that the calibration system is installed legally and on MAA property, behind the scenes it was scheming with JEA to bolster its relationship with JEA to further its other business interests. In fact, at one point, MAA's PR specialist told Fluid that it needed to "tone down" its defense and not address JEA's assertions head-on.

    e. MAA had evidence that the valves were effective, and Fluid was working in good faith to cure any issues with the installations, MAA had no intention of permitting Fluid to reinstall the valves on its properties, regardless of the steps that Fluid took to cure any issues.

    f. MAA then abruptly and unilaterally terminated its Master Valve Lease Agreement with Fluid.

111.   Each Defendant knew that these representations were false when made or made these representations recklessly without knowing whether they were true or false. Each Defendant intended that Plaintiff relied on these representations to act or not act in reliance on

them. In particular, MAA was well aware that Fluid was in good faith diligently (and "persistently") working to cure any problems with the installations, reinstall, and continue with the parties' Agreement, while it was colluding with JEA and planning to terminate its contract with Fluid. MAA knew that the Valves installed on residential water lines posed no threat to safety of its residents by its actions against Fluid, the Defendants knew or should have known that the Hydro would also be damaged.

## COUNT IV

### Intentional Interference with a Business Relationship

112.   Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

113.   Plaintiffs have a prospective/future business relationship with Fluid and the multi-family housing market nationwide.

114.   The Defendants have specific knowledge of the Plaintiff's prospective relationships with Fluid and future customers in the multi-family housing market nationwide.

115.   The business relationship and/or the prospective business relationship between the Plaintiffs and Fluid, as well as, the multi-family housing market has been diminished by the Defendants' conduct.

116.   The Defendants intentionally, and by improper motives, caused the relationship between Fluid, Plaintiff and the multi-family housing market to end and/or be diminished as a result of the unlawful and ongoing deliberate conduct.

## COUNT V

### Continuing Civil Conspiracy to Commit Unlawful Acts Forming the Basis for Counts I -IV & VI

117.   Plaintiff incorporates all allegations contained in the preceding paragraphs as if

fully set forth fully herein.

118.    Each Defendant entered into a tacit agreement of common design to defraud Plaintiff and to engage in conduct that forms the basis of all causes of action in Counts I – IV & VI alleged in herein. Specifically, Defendants' common purpose was *to obtain Plaintiff's money and imprimatur from Defendant's use of the Valve by unlawful means* as alleged in detail herein.

119.    Defendants' conspiracy and inter-corporate conspiracy was continuing in nature, with each Defendant making and continuing to engage in overt acts in furtherance of the conspiracy beginning in 2011 and going through 2014.

120.    Defendants' continuing conspiracy and inter-corporate conspiracy has proximately caused Plaintiff to sustain liquidated damages in the amount of approximately $1,000,000.00.

## COUNT VI

### Punitive Damages

121.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

122.    Each Defendant alleged herein acted intentionally and/or recklessly with respect to their wrongful conduct because they were aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiff by convincing Fluid to permit the manufacture, installation of and use the Valve under false pretenses. As a result, each Defendant's actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

123.    With respect to the applicable factors that may be addressed by the fact finder

when determining punitive damages, Plaintiff would allege as follows:

124.    The nature and reprehensibility of Defendant's wrongdoing is substantial because Defendants intentionally or recklessly lied to Plaintiff and to Fluid.

125.    Defendants were aware of the harm that could and would be caused to Plaintiff with respect to their wrongful conduct;

126.    Defendants' conspiracy and fraud was continuing in nature and spanned several years;

127.    In order to recover its losses, Plaintiff will incur substantial costs, including attorney's fees;

128.    Defendants profited significantly from the money they received from their fraudulent scheme and a significant punitive award is the only method to deter future similar misconduct.

129.    Based upon the above allegations and factors, Plaintiff would respectfully request the entry of a punitive award in an amount to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, jointly and severally against each of the Defendants on each Count of the Complaint and the following relief:

a.    Issue service of process and serve each Defendant not otherwise a party; Grant any reasonable request to Amend Plaintiff's Complaint to conform to the discovery and evidence obtained in this action;

b.    Award Plaintiff liquidated compensatory damages in an amount not less than $1,000,000.00;

c.    Award punitive damages against each Defendant as determined by the trier of

fact;

      d.     Award pre-and post-judgment interest in the amount of 10% per annum pursuant to TENN. CODE ANN. § 47-14-123 in amount according to the proof at trial;

      e.     Award costs and expenses incurred in this action pursuant to Rule 54.01 of the Tennessee Rules of Civil Procedure;

      f.     Award pre-and post-judgment interest as provided by law in amount according to proof at trial; and

      g.     Grant Plaintiff such further relief as the Court may deem just and proper.

Respectfully Submitted By,

**LAW OFFICE OF EDWARD M. BEARMAN**

EDWARD M. BEARMAN (#14242)
780 Ridge Lake Boulevard, Suite 202
Memphis, Tennessee 38120
(901) 682-3450
(901) 682-3590 – Fax
ebearman@jglawfirm.com

GARY E. VEAZEY (#10657)  by EMB
*Attorney for Petitioner*
780 Ridge Lake Boulevard, Suite 202
Memphis, Tennessee 38120
(901) 682-3450 – Phone
(901) 682-3590 – Fax
gveazey@jglawfirm.com